UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CLINT D. ABBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-CV-498 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.    Procedural History

On July 13, 2011, plaintiff Clint D. Abby filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of April 30, 2009.[1]   (Tr. 97-102).   After plaintiff's application was denied on initial consideration (Tr. 50-54), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 55-57).  Plaintiff and counsel appeared for a hearing on March 7, 2013.  (Tr. 28-47).  The ALJ issued a decision denying plaintiff's application on May 15, 2013.  (Tr. 13-24).  The Appeals Council denied plaintiff's request for review on January 17, 2014.   (Tr. 1-6).   Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.    Evidence Before the ALJ

## A.    Disability Application Documents

---

[1] Plaintiff previously filed for benefits on July 11, 1989.  (Tr. 112).  This application was denied on initial review and was not further pursued.

In his Disability Report filed on July 27, 2011 (Tr. 115-21), plaintiff listed his disabling conditions as a hernia, knee problems, arthritis in his left hand and left foot, upper and lower back pain, and depression. He stated that he stopped working on April 30, 2009 because of his conditions. He did not take any prescription medicines. The highest grade of school he completed was 9th grade. In the past, he had held positions as a bagger in a grocery store, a cook in restaurants, in packaging and assembly, as a surveyor for marketing company, and a telemarketer for a cement company. (Tr. 117, 123).

Plaintiff completed a Function Report on August 6, 2011. (Tr. 132-42). In the report, plaintiff stated that his daily activities consisted of bathing, sleeping, watching television, complaining, and taking Aleve. Uncomfortable pain affected his sleep. He prepared his own meals daily, and dusted, vacuumed, mowed, and washed dishes once or twice a month. He was able to walk, drive a car, and use public transportation. He shopped once a month, and was able to manage his bills. His hobbies included watching television, reading, and playing dominos. He stated that sitting or standing for short periods caused him back pain. He was able to follow instructions and get along with authority figures. He stated that he had used a cane, back brace, and leg brace in the past.

Plaintiff's friend, Rose Discher, completed a Third-Party Function Report in August 2011. (Tr. 143-52). Ms. Discher stated that plaintiff's daily activities consisted of watching television, talking on the phone, cleaning the house, cutting the grass, and reading. She reported that plaintiff prepared his own meals daily, but he did not have a good appetite and sometimes had an upset stomach. She stated that plaintiff went outside daily by himself. She also stated that plaintiff's

conditions affected his ability to lift, climb stairs, follow instructions, concentrate, remember, and get along with others. He would get out of breath when climbing stairs or lifting furniture, he easily forgot things, and he had a short temper. Ms. Discher also reported that plaintiff had "fears of someone trying to get him in trouble." (Tr. 150). She stated that plaintiff needed to use a brace often when his back, leg, or knee pain flared up.

In his Disability Report filed on January 6, 2012 (Tr. 164-68), plaintiff reported changes in his conditions beginning on October 30, 2011. He stated he had tingling in his wrist, pain in his ankles and shoulders, headaches, constant back pain, and pain in his forearms. He also was bedridden more often than usual. He did not report any prescription medications, but continued to take Aleve.

### B. Testimony at the Hearing

Plaintiff was 44 years old at the time of the hearing. (Tr. 30). He completed the ninth grade, but did not have a GED. He attended a trade school for data entry, but did not complete the program. (Tr. 30-31). In 2000, plaintiff was released from prison after serving a six-year term for first-degree assault and attempted murder. (Tr. 31). Also in 2000, he began working as a telemarketer at Advanced Promotions where he remained for two years "off and on." (Tr. 35).

Plaintiff testified that he had been seeing a chiropractor for the past 20 years for severe back problems. (Tr. 32). He also testified to having tingling pain in his left arm and pain in his legs from a fracture caused by bullets in 1986. (Tr. 32-33). The longest he could physically tolerate a work environment was for an hour and a half before he would need to sit down and take a break. He testified that he had been taking Oxycontin and Percocet for his pain as prescribed. (Tr. 40). Plaintiff

testified that the pain pills caused side effects, including stomach pain, difficult bowel movement, and nausea in the mornings. (Tr. 41).

Plaintiff stated he has had mental issues for the past 20 years. He testified to seeing and hearing things, such as "shadow walkers along the walls" that cause him to barricade himself in his house and grab weapons. (Tr. 33). He began going to St. Alexis twice a week for psychological care three weeks before the hearing; he had not seen a psychologist or psychiatrist on a regular basis before then. (Tr. 33-34).

Plaintiff testified that his mental health issues began when he was a child. (Tr. 36). He stated that he was physically and sexually abused as a child, and ran away from home at the age of 15. Since 2009, his mental health problems had become worse. He stated he became more violent, paranoid, schizophrenic, and less tolerant. (Tr. 36). Plaintiff testified that he had been diagnosed with bipolar disorder and PTSD. (Tr. 37). These conditions caused him to have problems dealing with authority and coworkers. He had emotional outbursts when he was given feedback from supervisors, and had been fired from jobs. His mind also wandered "a million miles an hour," and he disliked being told what to do. (Tr. 38-39, 41).

Plaintiff reported past problems with alcohol and marijuana. (Tr. 34). He smoked marijuana for 35 years, beginning when he was 7 years-old. He stopped smoking in August 2012. He drank a few beers a week if he could afford it. He reported drinking a 12-pack of beer every day or two in 2011. (Tr. 35).

Jeff Magrowski, Ph.D., a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and no past

relevant work that qualified as substantial gainful activity. (Tr. 42). The ALJ instructed the vocational expert that this hypothetical claimant had no physical restrictions; could carry out simple instructions and non-detailed tasks; could demonstrate adequate judgment to make simple work-related decision; could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; should not work in a setting which includes constant, regular contact with the general public; and should not perform work which includes more than infrequent handling of customer complaints. The ALJ asked if there were examples of work for such an individual. Dr. Magrowski responded that jobs existed for such a person in both the local and national economy as a bagger of garments or clothing and as a laundry worker. (Tr. 43).

Plaintiff's counsel asked Dr. Magrowski if his opinion would change if the hypothetical claimant had problems with concentration that would require him or her to take a 15-minute break every hour and was off-task. (Tr. 44). Dr. Magrowski responded that such a person could not perform those identified jobs. Plaintiff's counsel asked the doctor to then assume such a person was incapable of tolerating minor affronts and had trouble moderating interpersonal behaviors three times a day to the extent that it would interfere with that person's ability to perform his or her job. (Tr. 44). Dr. Magrowski responded that there would be no work for such a person. Plaintiff's counsel then asked the vocational expert if there were any jobs for a person with the hypothetical characteristics described by the ALJ who also would need special supervision because he or she frequently became

overly upset. (Tr. 45). Dr. Magrowski responded that there would be no jobs for such a person.

### C.  Medical Records

On November 7, 2009, plaintiff sought treatment at St. Louis University Hospital for a laceration on the left side of his forehead caused by a blunt object. (Tr. 245-58). He had experienced loss of consciousness and vomiting. Plaintiff stated he had been assaulted six days earlier. A CT scan showed a minimally displaced left lateral orbital wall fracture. There was some tissue swelling and small metallic foreign bodies were seen in the laceration. His wounds were healing and there were no signs of infection. He did not want police involvement. He reported smoking half a pack of cigarettes a day and occasional alcohol use. He was advised to continue to clean the head wound and was discharged with no follow-up arranged. On June 9, 2010, plaintiff sought treatment at St. Louis University Hospital for a swollen knee. (Tr. 259-60). He reported smoking one pack of cigarettes per day and marijuana. He was advised to take Advil as needed.

Plaintiff returned to St. Louis University Hospital in February 2011, after he was involved in a motor vehicle crash while intoxicated. (Tr. 261-93). He was uncooperative during intake, nearly hitting the intake physician. Test results returned positive for cannabis and he smelled of alcohol. All CT scans were negative. Trauma services refused to see him. His symptoms improved following intravenous fluids, Haldol, Ativan, and diphenhydramine. The next morning plaintiff had a swollen tongue and difficulty speaking. No acute intervention was deemed necessary. Exam results of plaintiff's spine based on his complaints of neck and back injury were normal with no evidence of fracture.

Dianna Moses-Nunley, Ph.D., conducted a consultative psychological examination of plaintiff on November 2, 2011. (Tr. 192-96). Dr. Moses-Nunley diagnosed plaintiff with bipolar disorder, anxiety disorder, and assigned a Global Assessment of Functioning score of 50.[2] She noted that plaintiff was guarded due to his lack of insight into his problems and distrust of mental health providers. Plaintiff was appropriately dressed and groomed at the evaluation. Dr. Moses-Nunley noted that plaintiff's social behavior seemed borderline inappropriate and overly demonstrative when he showed her his missing teeth and the outbreak of a rash on his torso. Plaintiff was disorganized in relating information and seemed inconsistent at times. He also described frequent feelings of depression and anxiety. His affect was variable and extreme.

As to plaintiff's daily activities, Dr. Moses-Nunley found marked impairment in his social functioning, no impairment to his self-care, adequate performance in tasks of concentration and pace, and poor persistence as suggested by his self-described behavior. (Tr. 195). She noted that plaintiff described various types of psychopathology, not all of which were credible. The doctor thought that plaintiff's endorsement of visual hallucinations and hearing music in his head were questionable and could be related to his years of substance abuse. Dr. Moses-Nunley opined that plaintiff did not appear able to tolerate minor affronts in daily life, did not seem to moderate his interpersonal behaviors appropriately, and would likely need to be placated quite often since he became overly upset. He

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations is not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000). A GAF of 41-50 corresponds with "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." Id. at 34.

demonstrated an adequate ability to understand and remember simple information and concentrate for a limited time, but his behavior suggested that staying on task to the degree required in a work setting would be problematic for him. Plaintiff had the ability to manage his own funds.

Inna Park, M.D., conducted an internal medicine consultative examination of plaintiff on November 2, 2011. (Tr. 197-205). Plaintiff reported that he had an abdominal hernia, knee pain, arthritis in the left hand and left foot, and back pain. He reported no use of medications. He said he drank three 24-ounce cans of beer each day and had last smoked marijuana one week earlier. Plaintiff reported surgery to repair a gunshot wound to his left knee in 1988 and repair of a stab wound to the abdomen in 1986. Dr. Park noted that plaintiff had good hygiene and normal physical endurance. Upon examination, the doctor did find any type of abdominal hernia. The doctor noted tenderness in the paraspinal muscles of plaintiff's back and tenderness to palpation. Plaintiff's left knee cracked, but there was no joint inflammation and no pain during range of motion exercises. Plaintiff was able to get on and off the exam table independently and he could squat to the floor and recover independently without complaint.

Kyle DeVore, Ph.D., completed a Psychiatric Review Technique on November 9, 2011. (Tr. 206-17). Dr. DeVore concluded that plaintiff suffered from bipolar disorder-not otherwise specified and anxiety disorder-not otherwise specified. Plaintiff had mild difficulties in maintaining social functioning but no other functional limitations. (Tr. 214). Plaintiff was appropriately dressed and groomed for the examination. Dr. DeVore noted that plaintiff's social behavior was borderline inappropriate and overly demonstrative. His affect was variable and extreme as he

was joking one moment and visibly upset and angry the next. Dr. DeVore stated that plaintiff was not fully forthcoming on his symptoms and most of them were inconsistent or not fully credible. The doctor concluded that plaintiff's condition was non-severe. (Tr. 216).

In November 2012 plaintiff sought care at the St. Louis University Hospital emergency department three times. (Tr. 294-97). At the first visit, on November 1, 2012, plaintiff complained of muscle and joint aching and reported that he'd had these conditions "for years." (Tr. 295). He was diagnosed with myalgia, skeletal pain, and a skin rash. He was prescribed Robaxin, Naprosyn, and Atarax, and was instructed to follow-up with a primary care provider. Plaintiff returned to the emergency department two days later, with complaints of chest pain with an onset date 32 years prior. (Tr. 298-303). He reported having chest cramps since August, a nervous stomach, anxiety, cold sweats at night, and morning vomiting. He rated the pain as 5/10. He asked to be checked for "male menopause." (Tr. 303). Chest x-rays, an EKG and lab tests were unremarkable. He was prescribed aspirin, ibuprofen, Percocet, and Valium. At his third visit, on November 11, 2012, plaintiff complained of shoulder pain. (Tr. 304-07). He reported having had left shoulder pain for 15 years, back pain for 2 years, bilateral knee pain from multiple gun shots, and abdominal pain for 8 years. He said he had lost 30 pounds in the past 4 years, and had vomited daily for 8 years. Plaintiff requested refills of Percocet, Valium, and Carisoprodol. After a physical examination he was discharged with no prescriptions for medications. Plaintiff became agitated when he was questioned about appointments he said he'd scheduled at Grace Hill for social services. He tried to steal two hospital blankets as he left.

On November 13, 2012, plaintiff went to St. Mary's Health Center emergency department, complaining of generalized pain. (Tr. 218-36). He reported having left shoulder and neck pain for four years. He was not taking any prescribed medication. Plaintiff appeared intoxicated and admitted to using crack cocaine. Following examination, plaintiff was discharged and advised to use over-the-counter pain medications. (Tr. 229).

On January 9, 2013, plaintiff began receiving chiropractic treatment at the Southside Health Center. (Tr. 237-44). On his patient information intake form, he reported back, knee, shoulder and neck pain. He also reported symptoms of fatigue, dizziness, and a headache. He was not taking any medication. Plaintiff reported having been the front passenger in a car accident at a red light four days prior. (Tr. 238). He stated that his knee hit the inside of the car, but the airbag did not deploy. He reported immediately feeling pain, but did not seek treatment at a hospital. He stated his pain was constant and unbearable. (Tr. 239). He saw a chiropractor approximately twice a week for the following six weeks.

### III. The ALJ's Decision

In the decision issued on May 15, 2013, the ALJ made the following findings:

1.  Plaintiff has not engaged in substantial gainful activity since July 13, 2011, the application date.

2.  Plaintiff has the following severe impairments: bipolar disorder and anxiety disorder.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following nonexertional limitations: able to understand, remember, and carry out least simple instructions and non-detailed tasks; demonstrate

adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; but, should not work in a setting which includes constant/regular contact with the general public; and, should not perform work which includes more than infrequent handling of customer complaints.

5.      Plaintiff has no past relevant work.

6.      Plaintiff was born on June 26, 1968 and was 42-years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      Plaintiff has a limited education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the plaintiff does not have past relevant work.

9.      Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

10.      Plaintiff's history of polysubstance abuse is not material to the decision.

11.      Plaintiff has not been under a disability, as defined in the Social Security, since July 13, 2011, the date the application was filed.

(Tr. 10-27).

## IV.    Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one

of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A);  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520;  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling

(SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

"The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the

objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.   Discussion

Plaintiff argues that the ALJ erred in his RFC determination by incorrectly assessing plaintiff's credibility, failing to address the weight given to the opinion of

consultative examiner Dr. Moses-Nunley, and failing to provide a narrative statement connecting plaintiff's RFC to his medical records.

## A.    Credibility Assessment

Plaintiff argues that the ALJ improperly disregarded his statements about the severity of his physical impairments.  An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the evidence as a whole.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The lack of supporting objective medical evidence also is a factor the ALJ may consider.  Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008).  If an ALJ discounts a claimant's subjective reports of pain, the ALJ is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found."  Id. (quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

The ALJ first noted that no objective medical records support plaintiff's physical complaints.  (Tr. 21); see Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider.").  The ALJ stated that the medical evidence supported the finding that plaintiff's physical conditions did not pose significant limitations on his physical abilities and would have no more than a minimal effect on his abilities to perform basic work activities.  (Tr. 21); see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) ("[A]n ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.") (internal quotations and citations omitted).  No doctor has ever stated that plaintiff could not work or that he is disabled.  (Tr. 22).

Second, the ALJ provided detailed reasons for discounting the GAF score Dr. Moses-Nunley assigned to plaintiff. (Tr. 22). The score was based upon a one-time examination that was conducted when plaintiff was not receiving treatment in any form. The findings supporting the GAF score given were based largely on the doctor's interview of plaintiff and his self-reported symptoms. Plaintiff attended the consultative examination with the understanding that the record of the exam would be included with his application for Social Security benefits. Furthermore, the ALJ noted that the purpose of the GAF scale is to plan treatment, measure the impact of mental illness, predict outcomes, and act as a report of an individual's overall level of functioning. The GAF scale "does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings." (Tr. 22). It also is not an assessment of an individual's ability to perform basic work activities. Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004). The ALJ provided sufficiently detailed reasons for discounting the plaintiff's GAF score.

The ALJ also noted that plaintiff's failure to obtain any mental health care treatment until three weeks prior to the hearing undermined his credibility. (Tr. 21-22). Plaintiff contends that that ALJ should have considered whether plaintiff's failure to follow treatment was a result of his mental impairment. See Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (noting that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal quotations and citations omitted). But see 20 C.F.R. §§ 404.1530(b), 416.930(b) (stating that an unjustified failure to follow prescribed treatment is grounds for denying disability). Plaintiff has

conflated the failure to follow prescribed treatment with the failure to seek any treatment at all. Plaintiff did not fail to take medications prescribed to him because of his mental illness; he failed to seek regular care from a mental health provider at all prior to his application for benefits. (Tr. 33). The ALJ was permitted to discount plaintiff's subjective complaints based on his failure to pursue regular medical treatment. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

Finally, the ALJ considered plaintiff's work record and daily activities. (Tr. 18, 21-22). Plaintiff had a poor work history with low earnings and had never worked at or above the level of substantial gainful activity. See Pearsall, 274 F.3d at 1218 (stating that a poor work history may lessen a claimant's credibility). While the ALJ did not discuss plaintiff's daily activities in his credibility assessment, elsewhere in the opinion the ALJ found plaintiff's restrictions in daily living activities to be mild. (Tr. 18). Plaintiff bathed, slept, watched television, complained, took over-the-counter pain medicine, prepared food, dusted, vacuumed, mowed the grass, washed dishes, read and played dominos. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon the claimant's credibility." Johnson , 240 F.3d at 1148; see Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding activities such as driving his children to work, driving his wife to school, shopping, visiting his mother, taking a break with his wife between classes, watching television, and playing cards were inconsistent with plaintiff's complaints of disabling pain).

Thus, the ALJ gave detailed reasons for his credibility determination, supported by substantial medical and non-medical evidence in the record.

**B.  Weight Given to Consultative Psychological Examination**

It is undisputed that the ALJ acknowledged Dr. Moses-Nunley's opinion and stated that he gave plaintiff the benefit of the doubt based on Dr. Moses-Nunley's report.  However, plaintiff argues that the ALJ erred by failing to assign weight to Dr. Moses-Nunley's opinion.  Furthermore, plaintiff suggests that Dr. Moses-Nunley's opinion deserves substantial weight, since it is the only opinion in the record from an examining physician.  Generally, more weight is given to the opinion of a source who has examined a claimant than a source who has not.  20 C.F.R. § 419.927(c)(1).  An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to evaluate the record as a whole."  Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

The ALJ discussed at length Dr. Moses-Nunley's opinions.  In determining plaintiff's RFC, the ALJ included Dr. Moses-Nunley's findings in plaintiff's nonexertional limitations. For example, the doctor noted that plaintiff demonstrated an adequate ability to understand and remember simple information and concentrate for a limited time, but his behavior suggested that staying on task in a work environment would be difficult for him.  (Tr. 195).  The ALJ incorporated this opinion into the RFC determination by limiting plaintiff to work requiring only the ability to understand, remember, and carry out simple instructions and non-detailed tasks and make simple work-related decisions.  (Tr. 19); see Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (holding that a hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently described deficiencies of concentration, persistence or pace).  Dr. Moses-Nunley also noted that plaintiff's ability to maintain appropriate social

interactions in employment settings was markedly impaired. (Tr. 195). The ALJ adopted this opinion by limiting plaintiff to work that involves only casual and infrequent contact with supervisors and co-workers and infrequent contact with the general public and handling of customer complaints. (Tr. 19). Therefore, the ALJ did give weight to Dr. Moses-Nunley's opinion in determining plaintiff's RFC.

The ALJ discounted Dr. Moses-Nunley's assessment of a GAF score of 50, because the score was based upon a one-time examination at which plaintiff self-reported his symptoms. (Tr. 22). The ALJ noted that no accompanying medical records supported a finding of such severity. "An ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence." Rosa v. Astrue, 708 F. Supp. 2d 941, 950 (E.D. Mo. 2010). To the extent the ALJ did not give substantial weight to Dr. Moses-Nunley's opinion, therefore, the lack of objective medical evidence for the opinion supports the ALJ's conclusion.

Furthermore, the hypotheticals posed by plaintiff's counsel to the vocational expert did not match Dr. Moses-Nunley's findings and thus do not support plaintiff's argument that no work exists for plaintiff. Dr. Moses-Nunley opined that plaintiff demonstrated an adequate ability to concentrate for a limited time, but staying on task in a work environment would be difficult. (Tr. 195). Plaintiff's counsel asked the vocational expert about the availability of jobs for a person who had problems with concentration and the ability to stay on-task that would require a 15-minute break every hour. (Tr. 44). Dr. Moses-Nunley did not opine as to how long plaintiff could concentrate or how frequently plaintiff would be off-task.

Additionally, Dr. Moses-Nunley stated that plaintiff did not appear able to tolerate minor affronts in daily life, did not seem to moderate his interpersonal behaviors, and would likely need frequent placating as he often becomes overly upset. (Tr. 195). Plaintiff's counsel posed questions to the vocational expert regarding hypothetical claimants who would be incapable of tolerating minor affronts three times a day to the extent it would interfere with ability to perform work and who would need special supervision. (Tr. 44). Because the limitations of these hypothetical claimants did not mirror plaintiff's conditions as reported by Dr. Moses-Nunley, the ALJ did not err in considering this evidence in his RFC determination.

## C. Narrative Record

Plaintiff next argues that the ALJ erred in failing to link the medical records to the RFC. A claimant has the burden to prove his RFC by providing medical evidence as to the existence and severity of an impairment. Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003); Snead v. Barnhart, 360 F.3d 834, 836 (8th Cir. 2004). "The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." Id. Because a claimant's RFC is a medical question, some medical evidence from a professional must support an ALJ's RFC determination. Id.

As noted by plaintiff, "the medical records are sparse regarding [his] mental impairments." Pl.'s Social Security Br., at *11 [Doc. #11]. "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v.

Shalala, 22 F.3d 186, 189 (8th Cir. 1994). The ALJ's duty to further develop the record only arises if a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2004). Beyond the medical records provided by plaintiff, the SSA ordered a consultative psychological examination by Dr. Moses-Nunley and a psychiatric review from Dr. DeVore. Plaintiff does not cite to any additional medical evidence that should have been obtained. The 7-page narrative discussion in the administrative decision shows that the ALJ reviewed the relevant evidence in the totality and based the RFC determination upon medical and non-medical evidence in the record as a whole. Thus, the ALJ did not fail to develop the narrative record.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 9th day of February, 2015.